NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0295n.06

Case No. 25-5198

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 09, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| MICAH COURTNEY GRAY, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: MOORE, NALBANDIAN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Investigators conducted several controlled drug purchases in late 2021, where they observed Micah Gray selling methamphetamine outside of his apartment. Officers afterward obtained a search warrant for the premises and a vehicle, where they later found and apprehended Gray. The searches led to more incriminating evidence, and a grand jury eventually indicted him on various drug-related charges. His case proceeded to trial. The jury convicted him on all counts, and the district court sentenced Gray to 288 months' imprisonment. We affirm his convictions and sentence.

**I.**

**A.**

In August 2021, law enforcement obtained a warrant to search Micah Gray's apartment. Officers had observed Gray participate in several controlled drug purchases in the parking lot

directly outside of his apartment. So they anticipated that Gray had more drug-trafficking evidence inside his apartment.

Before conducting their search, officers attempted to lure Gray away from the apartment by way of another controlled purchase. They planned to use a confidential informant to coordinate a transaction elsewhere so that law enforcement could avoid any confrontation, obstruction, or evidence tampering were Gray to be at home.

While trying to lure Gray away from his home, however, officers noticed a suspicious vehicle. They followed it and ran a registration check, discovering that the vehicle belonged to Gray's sister. Law enforcement then conducted a traffic stop and found Gray sitting in the passenger seat. Gray was arrested.

Officers searched his apartment afterward. There, they found various quantities of methamphetamine along with other drug paraphernalia. Officers then obtained a warrant to search his sister's vehicle. Inside, they discovered one of the marked bills that Gray had been given during one of the controlled buys.

**B.**

A grand jury indicted Gray. It charged him with three counts of distributing methamphetamine and one count of possession with intent to distribute methamphetamine, all in violation of 21 U.S.C. § 841(a)(1), (b)(1).

A slew of motions followed. Relevant here, Gray moved to suppress evidence from the apartment and vehicle at issue, arguing that there was no probable cause for the searches and that the state court failed to follow the proper protocol for issuing the warrants. After holding an evidentiary hearing, the district court denied Gray's motion. Gray then moved for funds to hire a handwriting expert to determine whether the state court judge had actually signed the search

warrants.  Gray also moved to exclude testimony about and photographic evidence of certain items found within his apartment depicting his name.  The district court denied both motions.

Gray continued to file motions until the day of trial.  The week before, he moved again to suppress evidence recovered from the apartment and vehicle, alleging this time that the search-warrant affidavits contained false statements.  He then moved to reopen the suppression hearing the day before trial because a duplicate search warrant for the apartment had been filed with the county clerk's office.  And that same day, he moved to disqualify the jury venire, alleging prejudice based on the racial composition of the jury.  The district court denied each motion as untimely, meritless, or both.

Gray's criminal trial proceeded as scheduled.  The jury convicted Gray on all four counts. The district court sentenced him to 288 months' imprisonment.

**II.**

Gray appeals.  He raises a variety of challenges to his convictions and sentence.  We address each argument in turn.

**A.**

We begin with Gray's challenge to the denial of his motions to suppress evidence from the searches of his apartment and his sister's vehicle.  We review the district court's legal conclusions de novo and its factual findings for clear error.  *United States v. Simmons*, 129 F.4th 382, 386 (6th Cir. 2025).  Because the district court denied Gray's motion, we consider the "evidence in the light most favorable to the government."  *United States v. Peake-Wright*, 126 F.4th 432, 436 (6th Cir. 2025) (quotation omitted).  We may affirm the district court's decision "on any grounds supported by the record."  *United States v. Whitley*, 34 F.4th 522, 535 (6th Cir. 2022).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also requires that officers have probable cause to obtain a search warrant for one's home or car. *Id.*; *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016). "Probable cause is a reasonable ground for belief of guilt" that "must be particularized with respect to the [place] to be searched." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation modified).

To have probable cause, the warrant authorizing the search must be supported by an affidavit establishing "a nexus between the place to be searched and the evidence sought." *United States v. Burrell*, 114 F.4th 537, 551 (6th Cir. 2024) (quotation omitted). Such a nexus exists if there is "a fair probability that the specific place that officers want to search will contain the specific things that they are looking for." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). The exclusionary rule bars the government from using evidence at trial obtained in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 231–32 (2011).

But even if an affidavit fails to establish probable cause, courts cannot suppress evidence from the search if the good-faith exception to the exclusionary rule applies. *United States v. Sanders*, 106 F.4th 455, 467–68 (6th Cir. 2024) (en banc). The good-faith exception applies if officers acted "in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).

This good-faith exception does not apply, however, if an officer relies "on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (citation modified). We refer to these deficient affidavits as being "bare bones." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). A search-warrant affidavit is bare bones when it "lacks a 'minimally sufficient nexus' between the place to be

searched and the evidence of wrongdoing to be seized at that place." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (per curiam) (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)). Yet where an affidavit provides even "a modicum of evidence, however slight, showing *some* connection, regardless of how remote it may have been between the criminal activity at issue and location of the search, there exists a minimally sufficient nexus necessitating application of the good faith rule." *Sanders*, 106 F.4th at 469 (citation modified).

**1.**

Gray argues that probable cause did not exist to search his apartment because the warrant's supporting affidavit failed to demonstrate a sufficient link between illicit drug activity and the premises. Yet even if we assume that the affidavit lacked probable cause, the good-faith exception applies.

Michael Lantrip, a detective who had served in local law enforcement for 34 years, signed the search-warrant affidavit. The affidavit indicates that Det. Lantrip "conducted controlled buys utilizing a confidential informant . . . in the parking area immediately outside [Gray's] residence." R. 39-1, PageID 78. It further states that Det. Lantrip monitored and recorded the buys, during which Gray sold methamphetamine to the informant.

The affidavit establishes a minimally sufficient nexus connecting Gray's residence to drug trafficking. Det. Lantrip observed Gray selling methamphetamine directly outside of his apartment. This suffices to save the search, as "a minimally sufficient nexus is not a high bar." *Neal*, 106 F.4th at 572 (citation modified). And "where it is simply debatable whether probable cause exists, an officer is justified in relying on a judicial finding of probable cause." *Id.* at 573. Thus, it was objectively reasonable for officers to rely on the supporting affidavit and resulting warrant to search Gray's apartment.

Gray makes no argument that the good-faith exception should not apply.

**2.**

Gray presses a similar argument with respect to the affidavit supporting the warrant for the search of the vehicle in which he was apprehended. But it fares no better.

Det. Lantrip also signed the affidavit for the search of a vehicle owned by Gray's sister. Like the one for the search of Gray's apartment, the affidavit stated that a confidential informant had participated in multiple controlled purchases of methamphetamine outside of Gray's residence. It conveyed that officers had searched Gray's residence and found controlled substances. And it noted that Gray had been arrested while he was in the vehicle "arranging a meeting place" with the informant for an additional sale of methamphetamine. R. 39-8, PageID 89. The affidavit also clarified that the vehicle had been secured and impounded after officers arrested Gray, indicating that any evidence within would have been preserved.

Again, even if we assume that the affidavit lacks probable cause, the good-faith exception to the exclusionary rule applies. The affidavit supplies a minimally sufficient nexus between Gray's drug-trafficking activities and the vehicle—he arranged a drug sale while in the vehicle. *See Neal*, 106 F.4th at 572. Gray again provides no argument against applying the good-faith exception.

**3.**

Gray contends that neither search warrant was valid because the issuing court failed to follow Kentucky Rule of Criminal Procedure 13.10. But "it is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008). To that end, "the exclusionary rule only requires the court to exclude evidence seized in violation of the Federal Constitution." *United States v. Beals*, 698 F.3d 248, 263 (6th Cir. 2012) (citation modified).

"Therefore, in determining whether evidence obtained solely by state officers is admissible in federal court in the first instance, it is usually irrelevant whether a state rule of criminal procedure was violated." *Id.* (citation modified). So even if we assume that the state court violated Rule 13.10, that would not be a basis to suppress the searches.

**4.**

Gray also contends that the district court erred when it denied his second motion to suppress evidence obtained from the execution of the two search warrants. That motion, filed on the eve of trial, asserted that the warrants for the search of his apartment and his sister's vehicle were invalid under *Franks v. Delaware*, 438 U.S. 154 (1978), because the supporting affidavits contained false statements.

The district court denied Gray's motion on untimeliness grounds *and* on the merits. On appeal, Gray contests only the merits disposition. Gray does not discuss the district court's untimeliness conclusion. This is fatal. "[W]e have held that a defendant who did not challenge every independent ground for a denial of a motion to suppress [can]not prevail on appeal." *United States v. Blake*, 166 F.4th 611, 619 (6th Cir. 2026).

**B.**

We turn next to the district court's decision not to reopen the suppression proceeding. We review a trial court's ruling on a motion to reopen a suppression hearing for an abuse of discretion. *See United States v. Lawrence*, 308 F.3d 623, 627 (6th Cir. 2002).

The day before trial, Gray moved the district court to reconsider its probable-cause findings and reopen the suppression hearing. He argued that his counsel, while at a state court clerk's office reviewing files, had recently discovered two copies of the warrant and supporting affidavit for the search of his apartment, filed a day apart. Gray wanted "the opportunity to question the officers

about the existence of two different affidavits and search warrants for the same apartment filed on two separate days" as, before this discovery, "he had no reason to know of their existence." R. 96, PageID 303–04.

The district court denied Gray's motion. The court acknowledged the "small differences between the[] two documents" but could not see "any reason why the existence of this twice-filed affidavit would cause any change in [the court's] previous suppression rulings." R. 119, PageID 572, 574.

Generally, a court should be "extremely reluctant" to reopen a suppression hearing. *United States v. Pittman*, 816 F.3d 419, 424 (6th Cir. 2016) (quotation omitted). Courts should therefore "consider several factors in deciding whether or not to grant a motion to reconsider." *United States v. White*, 455 F. App'x 647, 650–51 (6th Cir. 2012). These factors include whether the party seeking reopening has provided a "reasonable explanation" for not presenting the evidence earlier, "the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced." *Id.* at 651.

The district court did not abuse its discretion in denying Gray's motion to reopen the suppression hearing. Gray wanted to probe potential witnesses about why two copies of the warrant and supporting affidavit were filed for the search of his apartment. But this would not have moved the needle on any of the district court's rulings on his motion to suppress. As Gray conceded, any testimony elicited would not affect "any legal outcome or consequence." R. 119, PageID 573–74. That his motion would have been fruitless indicates that there would have been no legitimate point to reopening the suppression hearing.

**C.**

Gray argues that the district court erred in denying him funds for a handwriting expert. We review the district court's decision under the abuse-of-discretion standard. *See United States v. Roberts*, 919 F.3d 980, 986 (6th Cir. 2019).

After the district court's ruling on his first motion to suppress, Gray asked the district court for funds to hire an expert witness "to examine the signatures on the search warrants" because he did "not believe" that they actually belonged to the state court judge. R. 58, PageID 1225. The district court denied his request without prejudice. It noted that Gray had "not even attempted to make" a showing that this service was necessary for adequate representation and admonished him for engaging in the "type of fishing expedition [that] is explicitly prohibited by Sixth Circuit caselaw." R. 60, PageID 1237–38.

Under the Criminal Justice Act of 1964, an indigent defendant may request funds "to obtain investigative, expert, or other services necessary for adequate representation." 18 U.S.C. § 3006A(e)(1). The indigent defendant must show "(1) such services are necessary to mount a plausible defense, and (2) without such authorization, the defendant's case would be prejudiced." *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). He cannot meet this burden, however, by merely suggesting that "the requested service[] might turn up something." *Id.*

The district court did not abuse its discretion in denying Gray's motion. Gray's motion for additional funds contained no information to support the inference that he needed an expert. Although he argued the signature for his warrants may have been forged, the record reveals that the basis for this assertion was nothing more than Gray's speculation. But "an indigent criminal defendant may not use § 3006A(e)(1) to fund a speculative fishing expedition." *United States v. Howard*, 621 F.3d 433, 447 (6th Cir. 2010) (citation modified).

**D.**

We move next to Gray's contention that the district court impermissibly limited his access to grand-jury materials. We review the district court's ruling for an abuse of discretion. *See Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 221 (1979).

Prior to trial, Gray sought access to task force officer Donald Bowman's grand-jury testimony. Although, according to the government, the role that Bowman played in Gray's case was "fairly limited and mostly bureaucratic," Gray anticipated the government would call him to testify on "chain of custody sorts of issues." R. 131, PageID 1298. To that end, Gray believed "it would definitely be beneficial" to review Bowman's testimony to prepare for cross-examination. R. 73, PageID 231. The district court rejected his request because Gray did not present "a particularized reason to overcome the presumption of grand jury secrecy . . . outside the normal Jencks process." R. 131, PageID 1297.

The Grand Jury Clause of the Fifth Amendment requires the use of grand juries to institute federal criminal proceedings "for a capital, or otherwise infamous crime." U.S. Const. amend. V. "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil*, 441 U.S. at 218; *see also United States v. Rutherford*, 509 F.3d 791, 795 (6th Cir. 2007) ("It has long been recognized that grand juries require a generous zone of secrecy in order to perform their investigative functions."). Grand-jury secrecy remains "an integral part of our criminal justice system." *Douglas Oil*, 441 U.S. at 218 n.9. To that end, the Federal Rules of Criminal Procedure impose secrecy requirements subject to limited exceptions. *See* Fed. R. Crim. P. 6(e)(2)–(3). Relevant here, Rule 6 permits disclosure "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). Yet the party requesting disclosure must demonstrate a "particularized need," *United States v. Procter & Gamble Co.*, 356

U.S. 677, 683 (1958), so that the district court can properly "decide whether it is the need for secrecy that predominates, or the need for disclosure," *In re Grand Jury Proc.*, 841 F.2d 1264, 1268–69 (6th Cir. 1988).

The district court did not abuse its discretion in denying Gray's motion for disclosure of Bowman's grand-jury testimony. Gray failed to show a particularized need for the testimony. He argued that having Bowman's grand-jury testimony would help him cross-examine Bowman at trial. But as the district court emphasized, the Jencks Act would have required the government to disclose Bowman's prior testimony if the government called Bowman as a witness at trial. *See* 18 U.S.C. § 3500(b). Regardless, Gray suffered no prejudice from the district court's decision because the government never called Bowman as a witness.

Gray responds by highlighting the government's decision not to call Bowman as a trial witness. He claims that this justifies his request for the grand-jury testimony. But we fail to see how Bowman not testifying at trial creates a particularized need for Gray to access Bowman's grand-jury testimony.

**E.**

Gray argues that the racial composition of the jury venire violated his rights under the Jury Selection and Service Act (JSSA), the Sixth Amendment, and the Fifth Amendment. "Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review de novo." *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998) (citation modified).

Shortly before trial, Gray moved to disqualify the jury venire, arguing that the percentage of African American jurors on the panel was less than the percentage of African American individuals in the counties from which the venire was pulled. His cause for concern was that,

although the district was roughly 9% African American, the proportion of African Americans in the venire was no more than 3.8%.

The district court, in response, set time before trial began to ascertain "how the panel was selected." R. 119, PageID 583. Gray examined the jury administrator of the Western District of Kentucky's Paducah division, hoping to gather evidence for his claim. Yet the administrator knew little about the empaneling procedures aside from "push[ing] a button on the jury program" to get a list of jurors. *Id.* at 584. And she could answer almost none of Gray's questions. Although the district court understood "his jury pool lack[ed] racial diversity," it denied Gray's motion because he could not show a systematic exclusion of African American jurors in the jury-selection process. R. 102, PageID 351–52.

**1.**

We consider Gray's Sixth Amendment and JSSA claims together because they depend on the "same analysis." *United States v. Johnson*, 95 F.4th 404, 411 (6th Cir. 2024).

The Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury." U.S. Const. amend. VI. An "essential component" of this guarantee is the requirement that courts select all grand and petit juries "at random from a fair cross section of the community" in the judicial district or division where the court convenes. *Taylor v. Louisiana*, 419 U.S. 522, 528–29 (1975) (quotation omitted). This requirement focuses only on the "procedure for selecting juries, and not the outcome of that process." *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012).

To establish a prima facie case for a fair-cross-section claim, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this

underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). If satisfied, the burden shifts to the government to "justify[] this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 368.

The parties dispute only whether Gray has demonstrated that any underrepresentation of African Americans from the venire is due to systematic exclusion. He has not. In fact, Gray admits he lacks "a strong argument that the selection procedure is not racially neutral" because "the clerk offered very little insight about how the process worked." D. 40 at p.37. But Gray bore the burden to show that the process was discriminatory; the government was not obligated to prove otherwise. Without any evidence that African Americans have been systematically excluded from the jury pool, Gray's Sixth Amendment and JSSA challenges fail.

**2.**

We turn next to Gray's Fifth Amendment claim. The Due Process Clause of the Fifth Amendment provides: "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. The Supreme Court has explained that "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). Accordingly, the Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Sessions v. Morales-Santana*, 582 U.S. 47, 52 n.1 (2017) (quotation omitted).

A defendant may challenge the venire on equal-protection grounds, but he bears the burden of showing that the venire was selected in a discriminatory manner. *See Batson v. Kentucky*, 476 U.S. 79, 93 (1986). He can do so by showing either "(1) that [his] race was substantially

underrepresented on the particular venire from which [his] jury was selected AND that the venire was selected under a practice providing an opportunity for discrimination; or (2) that there has been systematic, long-term underrepresentation of [his] race on jury venires." *Allen*, 160 F.3d at 1105. Once the defendant meets this burden, "the burden shifts to the state to rebut the inference of intentional discrimination." *United States v. Ovalle*, 136 F.3d 1092, 1104 (6th Cir. 1998) (citation modified).

Gray has failed to establish a prima facie case under either test. He points to no evidence that the process used to select the venire provided an opportunity for discrimination. As noted above, he concedes that he lacks any evidence or "insight about how the [jury selection] process worked." D. 40 at p.36. And he offered no evidence of systematic, long-term underrepresentation of African Americans on jury venires. So his Fifth Amendment challenge fails.

**F.**

We turn now to the district court's evidentiary rulings. We generally review evidentiary rulings for an abuse of discretion. *United States v. Agrawal*, 97 F.4th 421, 429 (6th Cir. 2024). That said, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). "This harmless-error rule applies to a district court's error in admitting or excluding evidence." *Agrawal*, 97 F.4th at 429.

**1.**

We begin with Gray's claim that the district court erred by admitting into evidence certain images and testimony connecting his name to the apartment where drugs were found. Gray moved before trial to exclude photographic evidence—and related testimony—showing his name on items found within the searched apartment, such as mail and medical records. The court heard this

motion at the final pretrial conference, overruled his hearsay and best-evidence objections, and found the materials admissible.

Gray contends this was error. But even if it was, that ruling was harmless; other evidence connected Gray to the apartment. A trial court's evidentiary ruling is harmless where it does not affect the outcome of the trial. *United States v. Ray*, 803 F.3d 244, 257 (6th Cir. 2015). At trial, the government called the apartment's landlord, who testified that Gray was in that apartment "quite often." R. 120, PageID 868. Combined with the footage of Gray distributing drugs in front of the apartment complex, the landlord's testimony would have been enough for the jury to connect Gray with the premises where more drugs were found. Excluding other evidence tying him to the apartment would not change this outcome.

**2.**

Next, we consider whether the district court erred by excluding certain portions of video footage connecting Gray to the controlled purchases. During trial, the government played video footage of the controlled buys at issue. The excerpts played before the jury included the confidential informant's conversations with Gray. But they excluded the audio occurring beforehand and afterward, where Det. Lantrip met with the informant to discuss the buys. Gray requested that the court play the videos with full audio so that the jury could hear these conversations. He reasoned the jury could find the two were either tampering with or planting evidence.

The trial court permitted his request in part, allowing Gray to play portions of "rustling" in the video, which Gray claimed was proof of evidence tampering. *Id.* at 876. It did not, however, permit audio of the actual conversations between the informant and Det. Lantrip because both were present to testify and the footage offered no inconsistent statement to impeach either.

To begin, we note that Gray poses his challenge as one of "completeness." The rule of completeness provides: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106.

Once again, any alleged error was harmless—it did not affect the trial outcome. The government presented significant evidence implicating Gray in the charged offenses. Allowing the introduction of audio between the informant and Det. Lantrip would not have changed things. Moreover, Gray had an opportunity to cross-examine both witnesses to highlight any concerns he may have had about the portions of the videos that the jury did not get to hear.

**3.**

We move next to Gray's challenge that the trial court erred by overruling his chain-of-custody objection. At trial, the government called Det. Lantrip and a lab analyst to identify the bags containing methamphetamine that the confidential informant received from Gray. Det. Lantrip identified two of the bags because they were marked with his office's customary label. At the same time, he had trouble identifying the other bag as it appeared to be "marked from the lab" instead. R. 119, PageID 740. The government later called the lab analyst to clear up this discrepancy. She identified the bag, clarifying that "anytime there's knotted plastic bags or plastic that doesn't seal a hundred percent, rather than have material escape . . . , we just elect to put things in a smaller sealable bag so that no material is lost along the way." R. 120, PageID 906.

After the government moved to admit these items into evidence, Gray objected. He argued that the informant, who initially received the bags, should have testified to lay the foundation for the items' chain of custody. Gray, however, acknowledged that his objection went "to [the]

weight, not to [the] admissibility" of the evidence. R. 119, PageID 734. So the district court overruled his objections.

"Chain of custody issues are jury questions and the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010). Still, evidence is admissible only if it is authentic. *See* Fed. R. Evid. 901. The government must demonstrate that there is "no reasonable probability that the evidence has been misidentified or altered." *United States v. Fellmy*, 165 F.4th 501, 509 (6th Cir. 2026) (per curiam) (citation modified).

Gray's challenge fails. He raises no concerns that "establish more than a mere possibility that the evidence has been tampered with." *Id.* (citation modified). And he has conceded that his objections challenge weight, not admissibility. Although he points to Det. Lantrip's inability to identify one of the recovered bags containing methamphetamine, the lab analyst explained why the detective would not have recognized the bag. So Det. Lantrip's testimony does not render that bag inauthentic, and the district court did not abuse its discretion by admitting the evidence.

**G.**

Gray argues that the district court violated his right to compulsory process by not allowing him to call a witness who testified during the government's case-in-chief during his defense case. We review compulsory-process claims de novo. *United States v. Damra*, 621 F.3d 474, 485 (6th Cir. 2010).

The Sixth Amendment guarantees a criminal defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. This right "includes both the right to compel witnesses' attendance and the 'right to present' their testimony 'to establish a defense.'" *United States v. Pancholi*, 148 F.4th 382, 389 (6th Cir. 2025) (emphasis omitted)

(quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)).  Although the right to compulsory process is "an essential attribute of the adversary system," it is not without bounds.  *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).  The Sixth Amendment does not impart "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Id.* at 410.  To establish a constitutional violation, the defendant must show that the challenged evidentiary rule is "arbitrary or disproportionate to the purposes [it was] designed to serve," *Rock v. Arkansas*, 483 U.S. 44, 56 (1987), and that excluding the evidence "infringed upon a weighty interest" he had in presenting it to the jury, *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

During trial, the government called the confidential informant who purchased drugs from Gray to testify during its case-in-chief.  The informant testified about his background, relationship with Gray, and the controlled purchases at issue.  Gray cross-examined the informant about the purchases and his compensation for working as an informant.  After the government rested its case, Gray attempted to recall the informant during his case-in-chief, believing that he might give "a different answer" on the issue of compensation.  R. 121, PageID 1118.  The district court asked what basis Gray had to believe the informant would do so.  Gray's counsel responded, "I don't know."  *Id.*  The court denied the motion as Gray had no reason to elicit "duplicative testimony in [the] hopes that [the informant] might say something different the second time around."  *Id.* at 1118–19.

Gray's argument fails.  The Federal Rules of Evidence tell district courts to "exercise reasonable control over the mode and order of examining witnesses" to "avoid wasting time" and to "protect witnesses from harassment."  Fed R. Evid. 611(a)(2)–(3). The district court could thus preclude Gray from calling the informant during his case-in-chief to re-explore the same line of

inquiry made during his cross-examination of that witness. Gray has not shown that the court acted arbitrarily or that the court infringed one of his weighty interests. Gray references the Confrontation Clause in his brief, but he had an unimpeded opportunity to cross-examine the informant.

**H.**

Gray argues that the district court committed a jury-instruction error. "We review the legal accuracy of jury instructions de novo." *United States v. Zheng*, 87 F.4th 336, 341 (6th Cir. 2023). We consider "the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Underwood*, 129 F.4th 912, 942 (6th Cir. 2025) (quotation omitted).

Gray faced three counts of illegally distributing methamphetamine, in violation of 21 U.S.C. § 841(a)(1). To establish illegal narcotics distribution, the government had to prove: (1) Gray knowingly or intentionally distributed methamphetamine, and (2) at the time of such distribution, Gray knew the substance contained methamphetamine. *See United States v. Sumlin*, 956 F.3d 879, 891 (6th Cir. 2020). The Controlled Substances Act defines "distribute" as "to deliver . . . a controlled substance." 21 U.S.C. § 802(11). The Act further defines "deliver" as "the actual, constructive, or attempted transfer of a controlled substance . . . , whether or not there exists an agency relationship." *Id.* § 802(8).

The district court instructed the jury that distribution could be actual or constructive, and it defined constructive distribution as follows: "To establish constructive distribution, the Government must prove that the Defendant caused the methamphetamine to be delivered or transferred to another person, even if the Defendant didn't physically deliver or transfer the methamphetamine directly to another person." R. 103, PageID 356.

Gray argues that the district court's instruction was improper because it deviated from the pattern jury instructions. Our pattern instructions provide, in relevant part: "The term 'distribute' means the defendant delivered or transferred a controlled substance. [The term distribute includes the actual, constructive, or attempted transfer of a controlled substance.]." Pattern Crim. Jury Instr. 6th Cir. Ch. 14.02A (2025) (brackets in original). The use note for Instruction 14.02(a) tells district courts to "further define the term[] constructive" "in the context of possession in Instructions 2.10 and 2.10A." *Id.* Instruction 2.10 provides, in relevant part: "To establish constructive possession, the government must prove that the defendant had the right to exercise physical control over the ___, and knew that he had this right, and that he intended to exercise physical control over ___ at some time, either directly or through other persons." Pattern Crim. Jury Instr. 6th Cir. Ch. 2.10 (2025).

The district court did not deviate from the pattern instructions. It followed the instructions—defining the term "constructive distribution" by relying on the instruction explaining constructive possession. That the district court followed the pattern instructions "weighs in favor of a finding that the instruction was not misleading." *Underwood*, 129 F.4th at 942.

Gray further suggests that the instruction was inaccurate because it allowed the jury to convict him based on constructive distribution rather than actual distribution. But a person can violate the Controlled Substances Act through constructive distribution by "arranging or supervising [a] delivery, or negotiating for or receiving the purchase price." *United States v. Sadler*, 24 F.4th 515, 544 (6th Cir. 2022) (quotation omitted); 21 U.S.C. § 802(8), (11).

Because the district court's constructive-distribution instruction complies with the Controlled Substances Act, our precedent, and the pattern instructions, Gray's jury-instruction challenge fails.

**I.**

We turn last to Gray's sentencing challenge. He argues that the district court imposed a substantively unreasonable sentence. We review sentences imposed by the district court for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

A defendant's substantive-reasonableness challenge asserts that the sentence imposed is "too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). We limit ourselves accordingly to assessing "whether the length of the sentence is greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010) (citation modified). A sentence can be greater than necessary if the court "placed too much weight on some of the § 3553(a) factors and too little on others." *Rayyan*, 885 F.3d at 442. But the decision to assign more or less weight to any given factor is generally "a matter of reasoned discretion, not math." *Id.*

Gray claims that his sentence was too long. This argument lacks merit. The record shows that the district court weighed the relevant § 3553(a) factors when it imposed a below-Guidelines sentence. It contemplated mitigating factors like Gray's age and difficult upbringing. And it varied downward based on its "distaste" for imprisoning Gray beyond a length of time for which he would "be a threat to people in the same degree." R. 129, PageID 1269. At the same time, the court considered Gray's "lengthy criminal history and . . . apparent inability to turn the page thus far." *Id.* at 1266.

Gray concedes that the district court considered the appropriate mitigating factors, but he argues that it should have given them more weight than it did. Absent evidence of arbitrariness, however, a mere "assertion that the district court should have balanced the § 3553(a) factors differently . . . is simply beyond the scope of this court's appellate review." *United States v. Frei*,

995 F.3d 561, 567–68 (6th Cir. 2021) (citation modified). Gray has not shown that the district court acted arbitrarily.

## III.

For these reasons, we **AFFIRM** the district court's judgment.